NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARK TRANSPORT, LTD, and NORTHEAST TRANSPORTATION, INC., | : : : : |
| Plaintiffs, | : Civil Action No. 3:15-cv-8905-BRM-DEA : : |
| v. | : : : |
| ENRIQUE WATSON, J&J FARMS CREAMERY, INC., OCS II INC., and THE DANNON COMPANY, INC., | : **OPINION** : : : : |
| Defendants, | : : |
| and | : : |
| J&J FARMS CREAMERY, INC., | : : |
| Third-Party Plaintiff, | : : |
| v. | : : |
| COLDWAY SOLUTIONS, INC., | : : |
| Third-Party Defendant. | : : : |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiff Mark Transport, Ltd. ("Mark Transport") and Plaintiff Northeast Transportation, Inc.'s ("Northeast") (collectively "Plaintiffs") Motion for Summary Judgment against Defendants Enrique Watson ("Watson") and J&J Farms Creamery, Inc. ("J&J") (ECF No. 66) and J&J's Cross-Motion for Summary Judgment against Plaintiffs (ECF

No. 67). Both Summary Judgment Motions were opposed (ECF Nos. 68 & 69) and J&J filed a Reply Brief to Plaintiffs' Opposition. (ECF No. 70). Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Plaintiffs' Motion for Summary Judgment is **DENIED** and J&J's Cross-Motion for Summary Judgment is **GRANTED**.

## I.     PROCEDURAL HISTORY

On December 29, 2015, Plaintiffs filed a Complaint (the "Complaint") before this Court against J&J, Watson, Defendant OCS II Inc. ("OCS"), and Defendant The Dannon Company, Inc. ("Dannon") asserting causes of action for: breach of contract against Watson; conversion against J&J and Watson, negligence against J&J, Watson, and OCS; tortious interference against J&J and Watson; and vicarious liability against J&J and Dannon. (ECF No. 1.) Additionally, the Complaint also sought punitive damages against J&J and Watson. (*Id.*) On February 26, 2016, Plaintiffs filed a First Amended Complaint (the "Amended Complaint"). (ECF No. 11.)[1] On April 7, 2016, J&J filed its Answer to the Amended Complaint (ECF No. 26) and on August 22, 2016, J&J filed its Amended Answer to the Amended Complaint in which it asserted a third-party complaint against Third-Party Defendant Coldway Solutions, Inc. ("Coldway"). (ECF No. 32).

On April 19, 2016, this Court granted Motions to Dismiss filed by Defendants OCS and Dannon, dismissing the Amended Complaint with prejudice as to such defendants. (ECF No. 27.)

---

[1] While Watson is a defendant in this action, he has not filed an appearance nor has he participated in discovery exchanged between the parties.

On July 27, 2018, Plaintiffs filed a Motion for Summary Judgment against Watson on its causes of action for breach of contract, negligence, conversion, and tortious interference, and against J&J for negligence, conversion, and tortious interference pursuant to a theory of vicarious liability. (ECF No. 66.) On the same date, J&J filed a Motion for Summary Judgment seeking dismissal of Plaintiffs' claims.[2] (ECF No. 67.) On August 4, 2018, J&J filed an Opposition to Plaintiffs' Motion for Summary Judgment and on August 6, 2018, Plaintiffs filed an Opposition to J&J's Motion for Summary Judgment. (ECF No. 69). On August 15, 2018, Plaintiffs filed a Reply Brief to J&J's Opposition to its Motion for Summary Judgment. (ECF No. 70.)

## II.  FACTUAL BACKGROUND

### A.  The Accident and Mark Transport's FMCS Rating Downgrade

Mark Transport is a New Jersey corporation, wholly owned by Mark Pryslak ("Pryslak"), which provides commercial transportation services. (Pryslak Dep. (ECF No. 67-3, Ex. Q) at 7:17-8:5.) Mark Transport was incorporated in 2000. (ECF No. 67-3, Ex. Q at 8:1-2.) At all times relevant to this litigation, Mark Transport leased approximately thirty tractor trucks. (ECF No. 67-3, Ex. Q at 8:13-9:1.) Mark Transport had approximately three to six full time employees, comprised of office staff and tractor trailer drivers, and did not have any independent contractors. (ECF No. 67-3, Ex. Q at 9:2-10:8.)

Northeast is a New Jersey corporation incorporated in approximately 1999 and owned by Pryslak and Theodore Nykun ("Nykun"). (ECF No. 67-3, Ex. Q at 10:9-11:6.) Like Mark Transport, Northeast also provides commercial transportation services. (*Id.*) At all times relevant

---

[2] J&J's Motion for Summary Judgment only addresses Plaintiffs' claims against it and does not concern its Third-Party Complaint against Coldway.

to the litigation, Northeast owned "five [or] six" tractor trailers. (ECF No. 67-3, Ex. Q at 11:7-13.)

For approximately five or six months during 2013, Watson was employed by Northeast as a full-time tractor trailer driver. (ECF No. 67-3, Ex. Q at 12:14-13:23.) Watson was never employed by Mark Transport. (*Id.*) During his employment with Northeast, Watson was entrusted with and operated a tractor trailer owned by Northeast, freightliner FLD112 bearing vehicle identification number 1FUY3EDB5RH433940 (the "Truck"). (*Id.*; ECF No. 66-2 ¶¶ 5-6.)

On May 2, 2013, J&J contracted with Watson to deliver a shipment of dairy products from OCS's facility in Allentown, Pennsylvania to J&J's facility in Maspeth, New York, pursuant to a Bill of Lading number 80244065 (the "Delivery"). (ECF No. 66-2, Ex. A.) At the time of the Delivery, Watson was employed by Northeast as a truck driver and the terms of his employment contract mandated that he work exclusively for Northeast and for whomever Northeast was leasing its vehicles. (Pryslak Cert. (ECF No. 66-2) ¶ 4.)

On May 2, 2013, Watson finished his workday at 3:00p.m. and thereafter retained possession of the Truck. (ECF No. 66-2 ¶¶ 5-6.)[3] On the evening of May 2, 2013, Watson used the Truck to pick up a trailer from OCS's Allentown, Pennsylvania facility to make the Delivery to J&J. (ECF No. 66-2 ¶ 5.) Plaintiffs contend Watson did not obtain permission from Northeast or Mark Transport to use the Truck to make the Delivery. (ECF No. 66-2 ¶ 9.)

On May 3, 2013, at approximately 5:28 a.m., while en route to Maspeth, New York with J&J's shipment, Watson was involved in an accident in which he struck a steel barricade in the northbound lane of Route 440 in Perth Amboy, New Jersey. (ECF No. 67-2, Ex. O.) Watson

---

[3] At all times relevant to this litigation, the Truck was owned by, registered to, and insured by Northeast and at no time did J&J verify title, registration, or insurance of the Truck. (ECF No. 66-2 ¶¶ 8, 10.)

claimed he was "going straight ahead when he was cut off by a veh[icle] forcing him to hit the median barrier." (*Id.*) The vehicle which allegedly cut in front of Watson left the scene and was never identified. (*Id.*)[4]

Following the accident, Northeast, as the owner of the Truck, was issued separate summonses: improper welding of a torque bar, Summons #1216-G-462092; brakes out of adjustment, Summons #1216-G-462091; inoperable front brakes, Summons #1216-G-462094; improper display of USDOT markings, Summons #1216-G-462093; and operation of an uninsured commercial vehicle, Summons #1216-G-462095. (ECF No. 67-4, Ex. S ¶¶ 22-26.) Northeast pled guilty to each of the summonses in Perth Amboy Municipal Court and paid the associated fines. (*Id.*)

Following the accident, B&L Recovery Towing ("B&L") towed the Truck and trailer from the scene as the Truck was deemed inoperable. (ECF No. 66-2 ¶ 12.) Thereafter, J&J retrieved its trailer and shipment from B&L. (ECF No. 66-2 ¶ 13.) In October 2013, Mark Transport's Federal Motor Carrier Safety Rating ("FMCS Rating") was downgraded from "Satisfactory" to "Conditional." (ECF No. 66-2, Ex. F; ECF No. 67-4, Ex. U.) Plaintiffs contend the downgrade in FMCS Rating is attributable solely to Watson's May 3, 2013 accident. Specifically, Pryslak testified:

> A: DOT gives carriers ratings [of] satisfactory, conditional or unsatisfactory. We had a satisfactory rating. This accident got applied to our company Mark Transport and with that incident we got a conditional rating.

---

[4] Following the Accident, Officer Franco of the New Jersey State Police performed a vehicle inspection and prepared a vehicle examination report of the Truck, finding, *inter alia*, the Truck had: a damaged windshield; clamp or roto type brakes out-of-adjustment; brakes out of service; torsion bar cracked and/or broken; carrier name and United States Department of Transportation ("USDOT") number not displayed as required; and inoperative/defective brakes. (ECF No. 67-2, Ex. P.)

Q: How was that communicated to Mark Transport?

A: DOT came to do an audit. They said what is your involvement in this accident. We told them we don't have involvement in this accident because it wasn't our load. It wasn't our trailer. They said show us documentation of the load and I could not show them documentation because I have no knowledge of this load. They said well, who was he hauling for? As far as I knew it was J&J Farms so I gave the DOT officer J&J Farms phone number and they could not find out any information. So they applied that accident to my report card and thus gave me a conditional rating. And with our customers we have to have satisfactory ratings. If not, they do not tender us loads and they end their contracts, terminate their contracts.

Q: When did the DOT perform an audit of Mark Transport?

A: I don't know the exact date, but it was 2013.

(ECF No. 67-3, Ex. Q at 44:12-45:12.)

Pryslak further testified that the DOT will typically review approximately two to three years of records in conducting an audit. (ECF No. 67-3, Ex. Q at 46:4-14.) Mark Transport regained its "Satisfactory" rating in September 2017. (ECF No. 66-2 ¶ 24.)

Notably, Pryslak testified that he was unaware as to whether any other Mark Transport drivers had been in accidents during the time period relevant to the USDOT audit, and that he did not know if other factors – such as drivers' records – may have affected the decision to downgrade Mark Transport's FMCS Rating, stating:

Q: Do they look back three years, ten years, forever since the company was started when they determine the satisfactory or unsatisfactory rating for a company?

A: I do believe it is two or three years.

Q: . . . That three year period again between May of 2010 and May of 2013 did Mark Transport have its employees involved in any motor vehicle accidents with tractors either used of leased to Mark Transport?

A: I don't remember.

Q: For that three year period of time before the subject accident in May of 2013 they would go all the way back to May of 2010 you don't recall if Mark Transport drivers were involved in any other accidents?

A: Yeah, I don't think so. I am not positive. I have to look at the records. It could be a little. Who knows. I don't know.

Q: What is your understanding of how many accidents would trigger a change in rating from satisfactory to conditional or is it a point system?

A: I don't know how the DOT works. I do believe it is part of a point system how many trucks you got, blah, blah, blah, blah. This one took us over the edge.

. . .

Q: Is it only motor vehicle accidents that may trigger a change in a rating or will your employee tractor trailer drivers getting tickets, moving violations, would that also affect the rating?

A: I believe that would affect the rating also.

Q: Would it be at fault motor vehicle accidents or would not at fault accidents trigger change in rating?

A: I think it has to do with towable. They always bring up a tow. I don't know the exact. A towable accident is a chargeable accident.

Q: Towable as need a tow truck?

A: Correct.

Q: Fault for the accident may not be a factor?

A: I don't know. I don't know how they do their rating system. It is very complicated. It is all on their discretion.

(ECF No. 67-3, Ex. Q at 46:17-48:12.)

During discovery, Plaintiffs produced the driving abstracts of Northeast's six drivers, which indicated that three of the drivers, including Watson, had moving violations during the

three-year period preceding Watson's accident. (ECF No. 67-4, Ex. X.) Additionally, one of the drivers had his license suspended twice during this same three-year period. (*Id.*)

On October 11, 2013, Joseph P. DeLorenzo ("DeLorenzo"), the Director of the USDOT's Office of Enforcement and Compliance, sent a letter to Mark Transport informing Mark Transport of the downgrade of their FMCS rating to "Conditional" due to deficiencies identified in the USDOT's September 19, 2013 audit. The letter stated, in pertinent part:

> This proposed CONDITIONAL rating is the result of an onsite compliance review and evaluation of your safety fitness completed on September 19, 2013. A CONDITIONAL rating indicates that your company does not have adequate safety management controls in place to ensure compliance with the safety fitness standard that could result in occurrences of violations listed in 49 C.F.R. 385.5(a-k).
>
> This proposed CONDITIONAL rating becomes a final rating and goes into effect on December 11, 2013.

(ECF No. 67-4, Ex. U.)

Notably, DeLorenzo's October 11, 2013 letter does not mention Watson's May 3, 2013 accident whatsoever as a factor contributing to the USDOT's decision to impose an FMCS rating downgrade upon Mark Transport. (*Id.*)[5]

Plaintiffs claim damages of approximately $912,025.45. (ECF No. 66-2 ¶ 23.)[6] Plaintiffs damages are comprised of several different alleged losses: $15,500 in replacement value for the Truck, which Plaintiffs claim was totaled (ECF No. 66-2, Ex. D; ECF No. 66-2 ¶ 14); B&L

---

[5] As part of the audit, the USDOT also provided Mark Transport with a "Company Snapshot." The report indicates that, for the inspection period spanning for twenty-four months prior to April 20, 2015, six of Mark Transport's vehicles were taken out of service, one of Mark Transport's drivers was removed, and Mark Transport had one accident requiring a tow. (ECF No. 67-4, Ex. W.) The report does not identify these vehicles, driver, or incident. (*Id.*)

[6] While Plaintiffs claim $912,025.45 in damages, the total damages of proofs provided in discovery actually add up to $911,285.45.

retained a judgment against Plaintiffs for $15,397.45, plus interest and costs, in connection with its towing service in removing the Truck (ECF No. 66-2, Ex. E); and $880,388 in lost earnings, as Plaintiffs' top distributors, C&S Wholesale Grocers ("C&S"), which accounted for approximately 50% of Plaintiffs' business, declined to continue doing business with Plaintiffs due to a clause in the contract between the parties requiring carriers to maintain a "Satisfactory" FMCS Rating. (ECF No. 66-2, Exs. G-J.)[7]

## B. J&J and Coldway

J&J is a wholesale distributor of dairy products servicing the tri-state area since its incorporation in 1951. (ECF No. 67-4, Ex. V ¶ 1.) J&J services independent grocers as well as national supermarket chains with third-party dairy items as well as its own brand of produce, including butters, margarines, and cheeses. (ECF No. 67-4, Ex. V ¶ 2.) Coldway is a licensed and bonded freight shipping and trucking company located in Brooklyn, New York. (ECF No. 67-4, Ex. V ¶¶ 2-3.)

On January 2, 2012, J&J entered into an agreement with Coldway (the "Coldway Agreement") in which the parties agreed that Coldway "will provide delivery services for J&J." (ECF No. 67-4, Ex. V, attachment.) Among other things, the Coldway Agreement noted:

> 3. Independent Contractor's Right to Control Work. Coldway and the Owner/Operator drivers it retains shall be deemed to be Independent Contractors, who shall have all rights to control the work of transporting the products, including the right to determine the necessary trucks, equipment, tools, and/or supplies to be utilized; the work schedule of the Independent Contractors; the repair and maintenance schedules of the trucks and other

---

[7] Plaintiffs appended an expert report, prepared on August 11, 2017 by Charles S. Lunden, CPA/ABV/CFF of Bederson LLP, concluding that Plaintiffs suffered $880,388 in damages as a result of the business it lost from C&S following the Accident. (ECF No. 66-2, Ex. J.) Additionally, Plaintiffs also contend that several other distributors also declined to continue doing business with Mark Transport, although they do not name these distributors or list these alleged damages in their moving papers. (ECF No. 67-2, Ex. S ¶ 17.)

equipment utilized; and the selection of routes used to deliver the products and the manner of unloading the trailers and transporting the products into the stores to which they are delivered. Other than requiring proof that Coldway's Independent Contractors are in compliance with applicable licensing, registration and insurance requirements, J&J shall have no right of control over the work of Coldway or its Independent Contractors.

4. Coldway's Responsibilities. Besides the transport of J&J's products, Coldway will also perform those warehouse functions that will facilitate the orderly and efficient delivery of the product. Coldway will supervise and guide warehouse personnel in the picking, assembling and staging product, which will result in efficient loading of the trailers. Coldway shall be responsible for the inspection of all trailers loaded at J&J warehouse, to ensure that they are properly loaded and in compliance with all legal requirements. Coldway will provide, when asked, current information and reports as to the location, of products being transported by Coldway and its Independent Contractors. Coldway will ensure the timely delivery, as required, of products being transported.

4.[8] Compliance with Law. Coldway shall furnish J&J proof of valid current vehicle registrations, and valid current permits from the New York Department of Transportation. Coldway shall ensure that only properly licensed commercial drivers shall drive tractors making deliveries for J&J. Coldway shall be primarily responsible for the safety of the tractors and trailers utilized, the testing and inspection thereof, and compliance with all laws, rules, regulations and ordinances pertaining to the operation of those vehicles.

5. Insurance. Coldway will ensure that its Independent Contractors maintain a policy of general and automobile liability insurance, with or without an umbrella policy, so that total coverage shall be in an amount not less than one million dollars, combined single limit, for personal injury and property damage. All such policies shall name J&J as an "additional insured," and Independent Contractors shall furnish Coldway an insurance certificate issued by the policy issuers setting forth the coverages and providing that Coldway shall receive at least 30 days prior written notice of any cancellation or non-renewal of the policy.

6. Indemnification. Coldway shall indemnify and hold J&J, and its subsidiaries and affiliates, as well as each of their officers,

---

[8] The Coldway Agreement contains two separate paragraphs labeled as Paragraph "4."

employees and agents, harmless from any and all liability, damage, loss, claims, demands and actions of any nature whatsoever, that arises out of or is connected with the performance of the services required under this Agreement, including, without limitation, for allegedly negligent operation, or maintenance of any of its Independent Contractors' tractors. In addition, Coldway shall indemnify and hold J&J harmless from any loss of goods or cash entrusted by J&J or its customers, to Coldway or to Coldway's Independent Contractors.

7. No Joint Venture. Nothing herein shall be deemed to cause this Agreement to create an agency, partnership, or joint venture between the parties to this Agreement, nor shall this Agreement be interpreted or construed as creating or establishing the relationship of employer/employee between J&J and Coldway.

(ECF No. 67-4, Ex. V, attachment ¶¶ 3-7.)

The Coldway Agreement was in effect at the time of Watson's May 3, 2013 accident. Accordingly, Watson's services had been procured by Coldway for J&J pursuant to the Agreement at the time of the accident. (*Id.*)

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of

the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the

merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## IV.   DECISION

Plaintiffs filed a Motion for Summary Judgment, seeking judgment on its causes of action for conversion, negligence, and tortious interference with prospective economic advantage against J&J and Watson, as well its cause of action for breach of contract against Watson. (ECF No. 11 at 5-11.) Plaintiffs argue that J&J is vicariously liable for Watson's acts because he was hired by J&J to complete a delivery, Watson was a bailee of the Truck at the time of the accident, Watson owed Plaintiffs a heightened level of care because the bailment of the Truck was used for Watson's sole benefit, Watson was negligent in causing the accident, Watson unlawfully converted the Truck, and Watson tortuously interfered with Plaintiffs' existing and prospective contractual relationships. (ECF No. 66-4 at 2-8.)

J&J cross-filed a Motion for Summary Judgment arguing that it cannot be held vicariously liable for Watson's actions as he was an independent contractor hired by third-party defendant Coldway. (ECF No. 67 at 20-32.) Alternatively, J&J argues the evidence is

insufficient to demonstrate Watson's accident was the sole cause of its FMCS Rating downgrade, Plaintiffs fail to demonstrate that Watson acted negligently, and Plaintiffs have failed to proffer a liability expert, as required in this scenario. (*Id.*) The Court will address Plaintiffs' claims against J&J and Watson in turn.

### A. Plaintiffs' Claims Against J&J

J&J cannot be held vicariously liable for Watson's torts, as the record clearly indicates that Watson was not an agent of J&J, but an independent contractor hired by Coldway. "An agency relationship [capable of imputing liability from the agent to the principal] is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993) (citing Restatement (Second) of Agency § 1 (1958)). "There need not be an agreement between the parties" to create a principal-agent relationship, but rather, "'the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation.'" *Id.* (quoting *Henningsen v. Bloomfield Motors*, 161 A.2d 69, 78 (N.J. 1960)).

While an employer is vicariously liable for the torts of its employee under the doctrine of *respondeat superior*, so long as the employee is acting within the scope of his or her employment, *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003), it is well-established that an employer is not vicariously liable for the torts of an independent contractor. *See Mavrikidis v. Petullo*, 707 A.2d 977, 983 (N.J. 1998); *see also Bahrle v. Exxon Corp.*, 678, A.2d 225, 231 (N.J. 1996) ("Ordinarily, an employer that hires an independent contractor is not liable for the negligent acts of the contractor in the performance of the contract.")[9]

---

[9] New Jersey courts have recognized an exception to the rule that employers are not vicariously liable for the torts of its independent contractors when the employer engages an independent contractor to perform work that is "inherently dangerous." *Majestic Realty Assocs. v. Toti*

The New Jersey Supreme Court has provided a comprehensive explanation of the differences between an employee, for whom vicarious liability would apply, and an independent contractor, for whom vicarious liability would not attach. *See Carter*, 815 A.2d at 464; *see also Mavrikidis v. Petullo*, 707 A.2d at 983. In making such a determination, courts are instructed to consider: the extent of control which the employer may exercise over the details of the work; whether the employee or contractor is engaged in a distinct business or operation; the skill required in the particular occupation; whether the employer supplies the instrumentalities and tools for the employee or contractor; the length of time for which the person is employed; the method of payment; and the belief of the parties as to the relationship between them. *Carter*, 815 A.2d at 464 (citing Restatement (Second) of Agency § 220 (1958)); *see also Safarian v. American DG Energy, Inc.*, 622 F. App'x 149, 154 (3d Cir. 2015).

Here, the Coldway Agreement specifically categorizes Watson as an independent contractor hired by Coldway to deliver J&J's products. (ECF No. 67-4, Ex. V, attachment ¶ 3.) Paragraph 3 of the Coldway Agreement also specifies that the independent contractor drivers "shall have all rights to control the work of transporting the products, including the right to determine the necessary trucks, equipment, tools and/or supplies to be utilized." (*Id.*) Furthermore, the same clause also indicates that J&J "shall have no right of control over the work of Coldway or its Independent Contractors." (*Id.*) The Coldway Agreement makes clear the

---

*Contracting Co.*, 153 A.2d 321, 326 (N.J. 1959); *see also Mavrikidis*, 707 A.2d at 982-83. An "inherently dangerous" activity is one which "can be carried on safely only by the exercise of special skill and care" whereas the danger "inheres in the activity itself at all times, so as to require special precautions to be taken with regard to it to avoid injury." *Mavrikidis*, 707 A.2d at 989 (citing *Majestic*, 153 A.2d at 326); *see also* W. Page Keeton, Prosser & Keeton on the Law of Torts § 71 (5th Ed. 1984). This exception is inapplicable in this matter, as driving a truck cannot be classified as an inherently dangerous activity. *See Puckrein v. ATI Transport, Inc.*, 897 A.2d 1034, 1041 (N.J. 2006) ("[T]rucking is neither a nuisance per se nor has it been held to be an inherently dangerous activity requiring special precautions, thus warranting the imposition of a non-delegable duty to assure the safe transport of its goods on the public highways.")

understanding between the parties that Watson was not an agent or employee of J&J at any time during the relevant contract period, but rather, relied exclusively on independent contractors for product transportation, with Coldway responsible for warehouse functions, compliance with applicable laws and regulations, and procuring the necessary insurance. (ECF No. 67-4, Ex. V, attachment ¶¶ 3-7.) Furthermore, there is absolutely no evidence in the record that J&J actually controlled the trucking operations reserved to independent contractors in the Coldway Agreement or in any way oversaw Watson's work.[10]

Each of the factors for this Court to consider in determining whether Watson was an employee or independent contractor clearly weigh in favor of finding he was an independent contractor for whom vicarious liability does not apply. Accordingly, J&J is not vicariously liable for any of Watson's alleged torts. As each of Plaintiffs' claims against J&J are premised on a vicarious liability theory, Plaintiffs' Motion for Summary Judgment is **DENIED** as to its claims against J&J and J&J's Motion for Summary Judgment is **GRANTED**.

### B. Plaintiffs' Claims Against Watson

Plaintiffs moved for summary judgment on the four claims it asserted against Watson: negligence, conversion, tortious interference, and breach of contract. (ECF No. 66-4 at 2-8.) Accordingly, the Court will address Plaintiffs' Motion for Summary Judgment with respect to

---

[10] The *Mavrikidis* Court discussed three further exceptions whereby a principal may be held liable for the negligence of an independent contractor: "(a) where the [principal] retains control of the manner and means of doing the work which is the subject of the contract; (b) where he engages an incompetent contractor; or (c) where . . . the activity contracted for constitutes a nuisance *per se*." *Mavrikides*, 707 A.2d at 984. First, as discussed *infra*, the record is devoid of any evidence suggesting J&J actually controlled the manner or means of Watson's work. Second, the record also lacks any evidence suggesting Watson was incapable of performing the work for which he was hired or that he was actually negligent in causing the accident. On the contrary, Watson was not issued any summonses for his operation of the Truck whereas Northeast was issued several summonses for its substandard maintenance of the Truck. (ECF No. 67-4, Ex. S ¶¶ 22-26.) Finally, truck driving does not constitute a nuisance *per se. See Puckrein*, 897 A.2d at 1041 ("trucking is [not] a nuisance per se").

each cause of action in turn.

### i.    Negligence

In order to establish a claim for negligence under New Jersey law, a plaintiff must demonstrate, by a preponderance of the evidence, that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; (3) proximate causation; and (4) actual damages. *Polzo v. Cty. of Essex*, 960 A.2d 375, 384 (N.J. 2008); *Weinberg v. Dinger*, 524 A.2d 366, 373 (N.J. 1989).

Here, Watson was a bailee of the Plaintiffs' Truck. "The elements of a 'bailment' are delivery of personal property by one person to another in trust for a specific purpose, acceptance of such delivery, and express or implied agreement to carry out the trust and return the property to the bailor." *Srgo v. Getty Petroleum Corp.*, 854 F. Supp. 1164, 1175 (D.N.J. 1994). "In order to constitute a sufficient delivery of the subject of a bailment . . . there must be such a full transfer, actual or constructive, to the bailee as to exclude the possession of the owner and all other persons and give to the bailee, for the time being, sole custody and control thereof." *Id.* (quoting 8 Am. Jur. 2d Bailments § 1 (1980)). The record indicates that Northeast owned the Truck and entrusted it to Watson for a particular purpose, specifically, to make deliveries pursuant to his employment with Northeast. (ECF No. 67-3, Ex. Q at 12:14-13:23.) Accordingly, a bailor-bailee relationship existed between Watson and Plaintiffs.

Citing *American Anka Com. V. Wicaco Mach. Corp.*, 686 F.2d 1050, 1053 (3d Cir. 1982), Plaintiffs argue that a bailee using the entrusted property while acting for his or own sole benefit will be liable for mere "slight negligence." (ECF No. 66-4 at 4.) In *Wicaco*, however, the

Third Circuit was applying Pennsylvania state law.[11] Nevertheless, even when applying a "slight negligence" standard, Plaintiffs still have not demonstrated that Watson acted negligently in causing the accident.

Plaintiffs argue "Watson breached [the] slight negligence standard of care by driving Plaintiffs' Truck directly into a steel barricade while making the Delivery for J&J." (ECF No. 66-4 at 5.) Plaintiffs cite no evidence in the record to support this proposition, but merely contend it was "reasonably foreseeable that Watson – having already worked a full shift for Plaintiff – would have been driving in a sub-optimal state while making the Delivery in the early morning hours of May 3, 2013." (*Id.*) On the contrary, there is absolutely no evidence that Watson was operating the Truck negligently or that he was at all at fault for the accident. Indeed, Watson was not issued any summonses as a result of the accident, whereas Northeast was issued five summonses for, *inter alia*, improper welding of a torque bar, improper adjustment of brakes, and inoperable front brakes. (ECF No. 67-4, Ex. S ¶¶ 22-26.) The evidence suggesting the Truck's brakes was faulty, coupled with the fact that Watson was not issued a summons, certainly creates an issue of fact as to the root cause of the accident, and whether driver negligence was a contributing factor whatsoever. Accordingly, Plaintiffs have not satisfied the causation prong of the negligence inquiry, and therefore, Plaintiffs' Motion for Summary Judgment against Watson with respect to its cause of action for negligence is **DENIED**.

### ii.    Conversion

"Conversion is 'the exercise of any act of dominion in denial of another's title to the chattels or inconsistent with such title.'" *Latef v. Cicenia*, A-5747-13T2, 2015 WL 10458543, at

---

[11] While New Jersey law makes clear that the standard of care applied to a bailee using entrusted property for the bailor's benefit is "bad faith or gross negligence," it does not apply the "slight negligence" standard to a bailee's use of entrusted property for his or her own benefit, as does Pennsylvania law. *See Banks v. Korman Assocs.*, 527 A.2d 933, 934 (N.J. App. Div. 1987).

*5 (N.J. App. Div. Mar. 14, 2016) (quoting *Lembaga Enters., Inc. v. Cace Trucking & Warehouse, Inc.*, 727 A.2d 1026, 1029 (N.J. App. Div. 1999)). In the context of bailments, New Jersey courts have made clear that a "bailment contract is governed by the same rules of law that govern other contracts." *Srgo*, 854 F. Supp. at 1176. "In interpreting bailment contracts, as with contracts generally, an express agreement will prevail against general principles," and thus, "[i]t is improper to apply obligations except in the absence of express contractual terms." *Id.* (citing *Silvestri v. So. Orange Storage Corp.*, 81 A.2d 502, 504-05 (N.J. App. Div. 1951)).

Here, there is insufficient evidence in the record from which to conclude that, as part of the bailment agreement, Watson was disallowed from operating the Truck for other purposes. In support of its contention that "Watson did not obtain permission from Northeast or Mark [Transport] to use the Truck to make the Delivery," Plaintiffs cite only to the self-serving certification of its principal, Pryslak. (ECF No. 66-3 ¶ 7.) Indeed, Plaintiffs never provide a copy of the bailment agreement between Mark Transport and Watson, nor do Plaintiffs allege that the terms of the agreement were merely implicit. Accordingly, it is improper to imply such an obligation where no evidence of such has been provided, *Srgo*, 854 F. Supp. at 1176, and thus, there is a genuine issue of material fact as to whether Watson's act of dominion over the truck was in fact tortious. Therefore, Plaintiffs' Motion for Summary Judgment against Watson with respect to its cause of action for conversion is **DENIED**.

### iii.    Tortious Interference with Contractual Relations

In order to establish a claim for tortious interference with contractual relations under New Jersey law, a plaintiff must demonstrate: "(1) the existence of the contract (or the prospective economic relationship); (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages." *Velop, Inc. v.*

*Kaplan*, 693 A.2d 917, 926 (N.J. App. Div. 1997) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 36 (N.J. 1989)). "[M]alice in this context [does] not mean 'ill will toward the victim." *Velop*, 693 A.2d at 926. "Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Velop*, 693 A.2d at 926 (quoting *Printing Mart-Morristown*, 563 A.2d at 37). With respect to causation, "the victim need only prove that had there been no interference, there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Velop*, 693 A.2d at 926 (citations omitted).

Plaintiffs have not established a claim for tortious interference as they have failed to demonstrate any causation between Watson's accident and its loss of profits. Plaintiffs contend the accident "directly caused Plaintiffs' [FMCS] Rating to drop from 'Satisfactory' to 'Conditional,'" which in turn caused them to sustain damages as their contracts with several of their largest distributors require them to maintain a "Satisfactory" FMCS Rating. (ECF No. 66-2, Exs. G-J.) However, Plaintiffs proffered no evidence whatsoever linking Watson's accident to its FMCS Rating downgrade. On the contrary, DeLorenzo's October 11, 2013 letter to Mark Transport indicates that the downgrade "is the result of an onsite compliance review and evaluation of [Mark Transport's] safety fitness completed on September 19, 2013," months after the accident. (ECF No. 67-4, Ex. U.) DeLorenzo's letter further noted that Mark Transport "does not have adequate safety management controls in place to ensure compliance with the safety fitness standard that could result in . . . violations listed in 49 C.F.R. 385.5(a-k)." (*Id.*) Notably, the letter does not mention Watson's accident whatsoever. (*Id.*)

Moreover, Pryslak testified that he was not aware if Watson's accident contributed to the USDOT's decision to downgrade Mark Transport's FMCS Rating and conceded that other

violations may have also affected the rating. (ECF No. 67-3, Ex. Q at 46:17-48:12.) Accordingly, Plaintiffs have not demonstrated a "reasonable probability that [Mark Transport] would have received the anticipated economic benefits" absent Watson's alleged interference. *Velop*, 693 A.2d at 926 (citations omitted). Rather, the evidence in the record indicates that Watson's accident had no bearing on the downgrade of Mark Transport's FMCS Rating. Therefore, Plaintiffs' Motion for Summary Judgment against Watson with respect to its cause of action for tortious interference with contractual relations is **DENIED**.

### iv.     Breach of Contract

"To prevail on a breach of contract claim, a party must prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustain[] damages." *EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*, 113 A.3d 775, 787 (N.J. App. Div. 2015) (citing *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. App. Div. 2007)). Here, Plaintiffs provide no argument whatsoever as to how Watson allegedly breached a contract. Moreover, Plaintiffs have neither cited nor produced the contract which Watson allegedly breached. Accordingly, there is no evidence of the existence of a contract between Plaintiffs and Watson, and therefore, Plaintiffs' Motion for Summary Judgment against Watson with respect to its cause of action for breach of contract is **DENIED**.

### V.     CONCLUSION

For the reasons set forth above, J&J's Motion for Summary Judgment is **GRANTED** and Plaintiffs' Motion for Summary Judgment is **DENIED**.


Date: March 29, 2019                    */s/ Brian R. Martinotti*
                                        **HON. BRIAN R. MARTINOTTI**
                                        **UNITED STATES DISTRICT JUDGE**